## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. GLR-20-0092 |
| | * | |
| AVERY HAWKINS, | * | |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*

## **RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, through its attorneys, Robert K. Hur, United States Attorney for the District of Maryland, and Charles Austin, Assistant United States Attorney for said District, respectfully submits this Response in Opposition to Defendant Avery Hawkins' Motion to Suppress. ECF 18. The motion should be denied because law enforcement conducted a lawful investigative stop of Mr. Hawkins based on officer observations combined with training and experience in identifying signs of being armed. A Baltimore Police Department officer observed actions and characteristics consistent with being armed while in public, including a bulge in a pants pocket (while Mr. Hawkins was holding a cell phone) and a "security check," a motion to pat an area where a firearm is secured, before Mr. Hawkins changed his walking direction to avoid the officer. These observations provided "reasonable suspicion" sufficient to justify a lawful stop under *Terry v. Ohio*, 392 U.S. 1 (1968) to investigate further, especially so given Maryland's broad prohibition on carrying firearms in public. Having such suspicion, an officer may conduct a limited investigative stop, as well as a pat down for weapons in light of observations consistent with being armed. And after the officer's initial approach and inquiry (but before any frisk or other physical interaction), Mr. Hawkins attempted to flee the officers' presence, providing additional basis for frisking Mr. Hawkins and recovering the firearm in his pants pocket.

These specific facts establish reasonable suspicion required by the Fourth Amendment and long defined by Supreme Court and Fourth Circuit precedent. This is not, contrary to Mr. Hawkins' assertion, a matter of a baseless stop based solely on factors inappropriate for investigative detention and pat downs. The circumstances before the Court, which pertain to a *Terry* stop based on observations specific to the presence of a firearm rather conduct not involving dangerous weapons, do not resemble the disheartening, fatal interactions that his motion references. Rather, the totality of the circumstances, including video images, establish the lawfulness of the seizure in this case.

## INTRODUCTION AND PROCEDURAL BACKGROUND

On February 25, 2020, the Court authorized a criminal complaint charging Avery Hawkins with possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g). ECF 1. On March 10, 2020 a federal grand jury for the District of Maryland returned a single-count indictment charging the same offense. ECF 3. On April 3, 2020, Mr. Hawkins had his initial appearance on the Indictment. ECF 6. On May 1, 2020, the Court held a detention hearing and, after considering arguments from the parties, the Honorable Deborah L. Boardman ordered Mr. Hawkins' detention pending trial. ECF 14.

## STATEMENT OF FACTS

The facts set forth below summarize the anticipated evidence based on multiple sources, including witness testimony of the involved officers, body worn camera footage, and video surveillance.

On September 26, 2019, the defendant, Avery Hawkins, walked through a strip-mall style shopping center at the intersection of Frankford Avenue and Sinclair Lane in Baltimore, Maryland. Officer Steven Mahan, of the Baltimore Police Department (BPD), was engaged in routine, non-emergency business checks the shopping center, engaging employees at various establishments.

At approximately 11:37 a.m., Ofc. Mahan, standing outside of one of the businesses, observed Mr. Hawkins walking around a corner and toward him. At the time Mr. Hawkins and the officer saw one another, Ofc. Mahan observed a bulge in Mr. Hawkins' right front pants pocket, which Mr. Hawkins patted in a manner known as a "security check", an action known by law enforcement as consistent with being armed. Mr. Hawkins then changed his direction of travel, walking away from Ofc. Mahan and south on Frankford Avenue and occasionally glancing back in the officer's direction. Suspecting Mr. Hawkins to be armed, Ofc. Mahan entered his patrol vehicle and maintained visual contact with Mr. Hawkins as Mr. Hawkins walked to the intersection with Sinclair Lane, turned east on Sinclair Lane, and eventually re-entered the shopping center. During this time, Ofc. Mahan called for backup and noted he identified a possible armed person based on what he believed to be a bulge and outline consistent with a firearm.



Mr. Hawkins entered a "Beauty Supply" store in the shopping center, on the end opposite of where the two encountered one another. Ofc. Mahan parked his vehicle in the shopping center lot and entered the same store. As reflected on both body worn camera and the store's internal surveillance, Ofc. Mahan walked toward Mr. Hawkins, who was walking to the rear of the store, and asked to speak. When Mr. Hawkins inquired as to the reason for questioning, Ofc. Mahan advised that he wanted to ensure Mr. Hawkins did not have a firearm in his pants pocket. Mr. Hawkins advised he did not. Ofc. Mahan—standing feet away from Mr. Hawkins and not wielding his service weapon—asked Mr. Hawkins to remain where he was and lift his hands. Upon declining and seeing a second officer enter the store and walk down a different aisle, Mr. Hawkins attempted to run down an empty aisle toward the front door.





The second officer unsuccessfully attempted to intercept Mr. Hawkins, briefly impeding Mr. Hawkins' attempt to leave the store. Ofc. Mahan then apprehended Mr. Hawkins as Mr. Hawkins approached the front door to the store.



5

After the officers restrained Mr. Hawkins, an officer recovered a loaded firearm from Mr. Hawkins' front right pants pocket.



## ARGUMENT

The Motion seeks to suppress the firearm recovered from Mr. Hawkins, arguing that the officers stopped and searched Mr. Hawkins unlawfully. The United States respectfully requests that the Court deny the Motion and find the search and seizure in compliance with the Fourth Amendment, given the observations and experience of the involved officers. The Motion appears to argue the seizure is the result of an unlawful warrantless arrest. In doing so, it avoids the jurisprudence of *Terry v. Ohio* and its progeny, which govern this encounter. *Terry* applies a "reasonable suspicion" standard in permitting brief investigative stops and safety pat downs where officers have reason to suspect an individual is armed. Because it fails to apply this appropriate standard or grapple fully with *Terry*'s considerations, the Motion fails. To the extent it engages relevant *Terry* factors, the Motion disregards or minimizes the significance of the observations and

surveillance of the interactions and the firearm in Mr. Hawkins' pants pocket. When viewing the totality of the circumstances, as it must, the Court should find the facts support a lawful seizure.

### A. <u>Legal Standard</u>

A police officer may conduct a brief investigatory stop, known as a *Terry* stop, "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Once such a stop is conducted, the officer may inquire further to verify or dispel the officer's suspicions, and, if the officer reasonably believes that the suspect may be armed and dangerous, the officer may conduct a brief pat-down for weapons. *See Terry*, 392 U.S. at 23, 30. The level of suspicion required for a *Terry* stop is "less demanding than that for probable cause" and "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In evaluating the validity of a *Terry* stop, courts consider "the totality of the circumstances." *Sokolow*, 490 U.S. at 8. Factors which alone may be "susceptible of innocent explanation" can "form a particularized and objective basis for a stop when taken together." *United States v. Arvizu*, 534 U.S. 266, 277–78 (2002). While an officer's "hunch" will not justify a stop, *Terry*, 392 U.S. at 27, courts must permit "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273*; United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004) (reviewing courts should "give due weight to common sense judgments reached by officers in light of their experience and training"); *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) (reviewing courts should "credi[t] the practical experience of officers who observe what happens on a daily basis on the street").

Officers conducting a *Terry* stop are authorized to "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the

stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). Even a "complete restriction of liberty is valid," so long as it lasts "no longer than necessary to verify or dispel the officer's suspicion." *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995). Thus, "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest." *Id.* at 1109-10.

Mr. Hawkins attempts to avoid this analysis by setting forth the law on warrantless arrests and suggesting in a footnote that in 1991 the Supreme Court implicitly overruled *Terry*. Mem. in Supp. Mot. at 4-5 n.4. The Court should reject the invitation to consider this case outside of the *Terry* framework. Indeed, the Motion cites no authority for this alleged implicit overruling. Further, it fails to cite the litany of *Terry* cases decided by the Fourth Circuit (and its district courts) since 1991. *Terry* remains good law and applies here.

> **B. The officers had reasonable suspicion based on articulable facts to detain Mr. Hawkins and conduct a pat down, pursuant to *Terry* and its progeny, that would have led to the discovery and seizure of the firearm.**

Each step in the relevant series of events, as summarized in the Statement of Facts, comports with the Fourth Amendment and *Terry*. The Fourth Circuit identifies a number of factors that properly contribute to reasonable suspicion of criminal activity permitting a lawful *Terry* inquiry. One factor is an officer's observing a bulge in an individual's clothing. *Black*, 525 F.3d at 365. Also, a "security check," e.g., reaching for a pocket containing a weapon, "can contribute to a finding of reasonable suspicion that the suspect was engaged in criminal activity." *United States v. Foster*, 824 F.3d 84, 94 (4th Cir. 2016); *United States v. Humphries*, 372 F.3d 653, 660 (4th Cir. 2004). Another relevant factor is presence in a "high crime" area. *See United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010); *United States v. Black*, 525 F.3d 359, 365 (4th Cir.

2008). "Evasive conduct" may also support a lawful stop. *United States v. Smith*, 396 F.3d 579, 585-87 (4th Cir. 2005); *Humphries*, 372 F.3d at 657-60.[1]

The Fourth Circuit's *Mayo* decision establishes the lawfulness of the stop here. In *Mayo*, the court found reasonable suspicion to stop the defendant under *Terry* based on: (1) an encounter in a "high crime area" targeted for "special enforcement," (2) the defendant "put[ting] his hand in his pocket", i.e. a security check, upon seeing a marked patrol car and "the appearance of something heavy in his pocket," (3) the defendant attempted to evade police scrutiny by "'turn[ing] 180 degrees' and walk[ing] from the street into an adjacent apartment complex" and then walking away from the police upon seeing them again, and (4) exhibiting "unusually nervous behavior" after being approached by the officers and asked if he had a weapon. 361 F.3d at 803-04, 807-08. The officers' observations, combined with their training and experience, indicated the defendant was carrying a concealed weapon without a permit, in violation of Virginia law. *Id.* at 808. The totality of these circumstances provided reasonable suspicion, based on articulable facts, to approach the defendant. *Id.* And because these facts supported a reasonable belief the defendant was armed, the officers could conduct a pat down in the interest of their personal safety. *Id.* (citing *Adams v. Williams*, 407 U.S. 143, 146 (1972)).

Until Mr. Hawkins' flight before the any pat down, this case is sufficiently similar to the lawful stop and search in *Mayo*. The government anticipates testimony establishing multiple aforementioned factors existed within moments of Ofc. Mahan encountering Mr. Hawkins. Upon

---

[1] To be sure, while neither a "high crime area" nor "unprovoked flight" is sufficient independently to support reasonable suspicion, *Wardlow*, 528 U.S. at 124, both are relevant factors that may be combined with others to establish reasonable suspicion, *id.*; *Black*, 525 F.3d at 365-66 (presence in a high crime area *plus* other enumerated factors provides reasonable suspicion). Thus, to the extent facts establish the presence of either, they cannot be as swiftly and necessarily excluded from the Court's consideration as Mr. Hawkins suggests.

first encountering Mr. Hawkins in the shopping center, Ofc. Mahan observed both a bulge in Mr. Hawkins' clothing—which he considered to be an outline consistent with a firearm—and a security check. And after seeing Ofc. Mahan, Mr. Hawkins changes direction, taking a circuitous route along the street and around the parking lot to reach the other end of the shopping center. This may be viewed as evasive conduct along the lines of turning 180 degrees and walking in a different direction, as occurred in *Mayo*. Each of these are appropriate bases for a *Terry* stop. The reasonableness of the suspicion that the bulge and/or outline was a firearm is further supported by the fact that Mr. Hawkins held a cellular phone in his hand. That being the case, an officer could suspect or conclude that a large bulge in a pants pocket is not a cellular phone, and, given the outline, in fact a weapon. Of course, even the possibility of an alternative, "innocent explanation" for the bulge, e.g., that the object could have been a cell phone (as the Motion suggests), "does establish a lack of reasonable suspicion." *United States v. Perkins* 363 F.3d 317, 327 (4th Cir. 2008) (citing *Wardlow*, 528 U.S. at 125). Further, subject to limited statutory exceptions, Maryland law prohibits "wear[ing], carry[ing], or transport[ing] a handgun, whether concealed or open, on or about the person." Md. Code Ann., Crim. Law § 4-203(a)(1)(i). The conclusions drawn from these observations provide a reasonable suspicion of unlawful possession of a handgun in public.

Having both reasonable suspicion of unlawful activity and, relatedly, reasonable belief that Mr. Hawkins was armed, Ofc. Mahan was permitted to both detain Mr. Hawkins and conduct a limited weapons frisk. *United States v. Hensley*, 469 U.S. 221, 226-28 (1985); *Black*, 525 F.3d at 365 (finding lawful a stop and pat down based on "reasonable suspicion that [defendant] had a firearm concealed in his pocket"); *Mayo*, 361 F.3d at 807 (same). It is of no moment that it was possible (even if unlikely in Maryland) that an individual may have a permit to carry a concealed

firearm. *United States v. Robinson*, 846 F.3d 694, 696, 701 (4th Cir. 2017) (en banc) (possibility of concealed carry permit "inconsequential" to lawfulness of protective frisk associated with valid *Terry* stop); *see also United States v. Kingsborough*, 744 Fed. App'x 139, 145 (4th Cir. 2018) (noting that reasonable suspicion of handgun possession justified *Terry* stop given that Maryland "broadly prohibits anyone from carrying a handgun in public").

As video evidence shows, and anticipated witness testimony would corroborate, Ofc. Mahan approached Mr. Hawkins in the store, and did so while asking questions from a distance and without drawing a weapon. The initial contact inside the store occurred one-on-one and before a second officer entered the store and approached Mr. Hawkins. Ofc. Mahan asked Mr. Hawkins to consent to a search, which Mr. Hawkins declined. After doing so, and with the officers still beyond arms' reach and *not* wielding their weapons, Mr. Hawkins then attempted to flee the store, running down an empty aisle with a clear path to the door. Falling within the spectrum between evasive conduct and headlong flight, this attempt also contributed to reasonable suspicion supporting a *Terry* stop (and safety pat down). *See Humphries*, 372 F.3d at 660 (defining as "evasive" an individual's "immediately walk[ing] away as the officers approached" and entering a residence despite a request to stop). Thus, this is not the sort of "unprovoked flight" that Mr. Hawkins suggests cannot support the stop and seizure here.

And while the term "high crime area" escapes a consensus or scientific definition, the government anticipates testimony that the area around the shopping center experienced criminal or other suspicious activity in the days prior to the challenged seizure. Such activities led to the "business checks" that Ofc. Mahan was engaged in the morning of the detention. To the extent

the Court finds evidence of a "high crime area", that factor would further strengthen the lawfulness of a *Terry* inquiry. *Black*, 525 F.3d at 365-66.[2]

The Motion tenders no effective rebuttal to these factors and observations. Despite first stating that the facts of the seizure are "relatively uncontested," Mr. Hawkins relies largely on the argument that the perception of a bulge and outline of a firearm is objectively "false." Mem. in Supp. Mot. to Suppress at 6. The government submits that the evidence contradicts this conclusion, and establishes the truth of this observation, a fact that Mr. Hawkins concedes is "critical" to the resolution of the Motion. *See id.* In referencing only store surveillance camera footage, which is of limited value regarding the firearm outline, given the positions of the cameras, Mr. Hawkins ignores other video evidence. Specifically, body worn camera footage at the time of Mr. Hawkins' detention corroborates Ofc. Mahan's report and assertions regarding a firearm outline in Mr. Hawkins' right front pants pocket. *See supra* at 5 (bottom photo). And while it focuses on the attempted flight from the store, the Motion is mostly, if not completely, silent—no doubt a result of not applying *Terry*—on the relevance of his actions prior to the questioning, including the security check and changing directions upon first seeing a uniformed officer.

In sum, the observed bulge and security check, on their own, were enough to raise suspicions, and may have been sufficient on their own to support a *Terry* stop and pat down. Not acting immediately, the officers did what courts ask them to do: continue investigating. As a result, the officers observed confirmed the presence of a cell phone in Mr. Hawkins' hand (and thus not his pocket) and his unusual walking path to a store within the shopping center. Only after that did the officers approach calmly and inquire about those suspicions. And then Mr. Hawkins attempted

---

[2] Given the other factors and observations discussed, this factor is relevant but not necessary to finding the stop and seizure lawful.

to flee after brief questioning. Each of these considerations in appropriate. Added together, they satisfy *Terry*'s demands and provide a lawful basis for the firearm seizure.

> C. **Because the detention and pat down was lawful under *Terry*, any assertion that the officers effected a warrantless arrest is both incorrect and, ultimately, irrelevant.**

As a final matter, notwithstanding any error in citing the appropriate legal standard, Mr. Hawkins' argument that this involved a warrantless arrest misses the mark for two reasons. First, a suspect's inability to end an encounter does not necessarily convert a lawful *Terry* stop to a warrantless arrest. *See United States v. Hamlin*, 319 F.3d 666, 671 (4th Cir. 2003). Nor does the use of handcuffs, which are a permissible tool to maintain the status quo as necessary during a *Terry* stop. *Id.* In *Hamlin*, the officer had a basis to perform a safety pat down for safety reasons and advised the suspect of his intent to do so. The suspect refused, and the officer used handcuffs. The Fourth Circuit affirmed the denial of the motion to suppress, finding the physical restraint did not elevate a *Terry* stop to an unlawful arrest. *Id.* at 672. Therefore, the officers involved in Mr. Hawkins' stop and seizure could physically restrain Mr. Hawkins for the purpose of effecting the *Terry* stop and pat down, without elevating the encounter beyond *Terry*'s scope and analysis.

Second, the lawfulness of a *Terry* pat down in this circumstance—which uncovered Mr. Hawkins' firearm—renders irrelevant the legality of the arrest. *See Humphries*, 372 F.3d at 661-62 (Gregory, J., concurring in judgment). In *Humphries*, a pat down incident to arrest revealed a handgun in the area where officers observed Humphries conduct a security check prior to the encounter. 372 F.3d at 655-56 (majority op.). The district court found that the *Terry* stop was lawful but the arrest was not; the Fourth Circuit reversed on that second point, finding probable cause to arrest Humphries. *Id.* at 660. Concurring in the judgment, Judge Gregory found "harmless" the arrest's preceding the search because "nothing was gained from the arrest other than that which would have been properly seized pursuant to the lawful pat-down and investigative

detention." *Id.* at 661-62 ("Surely, evidence later seized, which could have been lawfully seized earlier, is not fruit of the poisonous tree when the 'tree' itself—the stop and pat down—was never poisonous in the first instance."). Mr. Hawkins' situation is analogous in that any arrest—which the government does not concede occurred unlawfully—is irrelevant because the officers could have (and did) seize the firearm pursuant to a lawful and proper *Terry* detention and pat down.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the motion to suppress.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:     /s/
Charles Austin
Assistant United States Attorney
36 South Charles St., 4th Floor
Baltimore, Maryland 21201
Tel.: (410) 209-4800

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of September 2020, a copy of the foregoing Response was electronically filed with notice to all counsel of record.

_____/s/_____
Charles Austin
Assistant United States Attorney